# FLORIDA AFL-CIO UNITED LABOR AGENCY, INC. v STATE OF FLORIDA, DEPARTMENT OF LABOR AND EMPLOYMENT SECURITY

## Case No. 88-2755

State of Florida, Division of Administrative Hearings

January 20, 1989

### APPEARANCES OF COUNSEL

**Sidney L. Matthew,** Gorman & Matthew, P.A., for petitioner.

**David J. Busch,** Department of Labor and Employment Security, for respondent.

### OPINION OF THE COURT

MICHAEL M. PARRISH, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice a formal hearing was conducted in this case on October 19 and 20, 1988, at Tallahassee, Florida, before Michael M. Parrish, a duly designated Hearing Officer of the Division of Administrative Hearings. The parties were represented at the hearing.

### *ISSUES AND INTRODUCTION*

By amended petition for hearing, the Petitioner requested a hearing

on the Department's determination that the Petitioner is obligated to refund to the Department the sum of $53,724.00, which the Department asserts is the amount by which the Petitioner was overpaid pursuant to Wagner-Peyser Construct No. SA016. For numerous reasons recited in its Petition and argued in its post-hearing brief, the Petitioner contends that it should not be required to refund the disputed sum.

At the formal hearing, both parties presented the testimony of witnesses and both parties offered exhibits in support of their respective positions. Following the hearing, a transcript was prepared and the parties were allowed until November 19, 1988, within which to file their proposed recommended orders. Thereafter, upon joint motion of the parties, the period for filing post-hearing briefs and/or proposed recommended orders was extended until December 6, 1988. Both parties timely filed post-hearing briefs in a format more customary to appellate than to administrative hearing proceedings. The parties' briefs have been carefully considered during the formulation of this recommended order. Specific rulings on the factual assertions of the parties are contained in the appendix to this recommended order.

## FINDINGS OF FACT

Based on the stipulations and admissions of the parties, on the exhibits received in evidence, and on the testimony of the witnesses at hearing, I make the following findings of fact.

1. In November of 1984 the Petitioner and the Respondent entered into a contract which has the following title:

### GOVERNOR'S WAGNER-PEYSER 10% DISCRETIONARY FUNDSFIXED-UNIT PRICE CONTRACT CONTRACT NO.
*SA016*

### "STATEWIDE FARMWORKERS JOB PLACEMENT PROJECT"

2. Paragraph 1.A. of the subject contract contains the following description of the project activities:

The Florida AFL-CIO United Labor Agency will operate a statewide job placement program to meet the increased employment needs of migrants/farmworkers and related workers involved in the processing of agricultural products. The Agency will coordinate and work with farmworker advocacy organizations in Apopka and Dade City, Florida, to recruit and identify participants. Unsubsidized employment opportunities will be developed with unions, apprenticeship programs, and private sector employers. The employment

resources of the Agency will be coordinated and integrated with those of the Job Service and local PICs.

3. Paragraph 2.A. of the subject contract contains a "work activity plan" described as follows:

1. To recruit and provide employability counseling to migrants/farmworkers;

2. To place 230 migrants/farmworkers into unsubsidized, non-agricultural employment with a duration of 30 days or more;

3. To integrate the employment resources of unions and the United Labor Agency with those of the Job Service;

4. Prepare and submit a final narrative report to DLET documenting the success and failures of the project.

4. Paragraph 2.B. of the subject contract contains the following description of the performance units applicable to the contract:

1. The contractor will make up to 230 placements in unsubsidized employment over the course of the contract period at $726.00 each, for a total amount not to exceed $166,980.00.

2. A placement will be defined as employment by a participant engaged in work for at least 35 hours per week, in a job paying at least the minimum wage, for a period of at least 30 calendar days.

5. At Paragraph 2.D. of the subject contract, under the subcaption "ACTIVITY/PAYMENT SCHEDULE OF PERFORMANCE UNITS,"

the contract provides, in pertinent part:

1. The contractor will be advanced $37,062.00.

2. The advance will be repaid monthly by deducting $6,177 per month from the amount of deliverables produced over a six month period, beginning with the November 1984 invoice and being completed with the April 1985 invoice.

3. There will be one performance unit for this contract, and it will be for placement at the rate of $726.00 each.

6. Pargraph 14.e. of the subject contract reads as follows:

The Contractor is responsible for fulfilling all terms and conditions of this Contract. While the DLET shall monitor the Contractor's performance under the Contract, the Contractor remains solely responsible for its performance. The DLET monitoring of the Contract shall not constitute a waiver or modification of any term or

condition. Terms and conditions may only be modified by written contract amendment as specified herein.

7. One of the documents used in the administration of the subject contract was a Form BRI-100, which was designed so that three individuals had to sign the form to certify that a valid job placement had been accomplished. The required signatures were those of the employer, the farmworker/employee, and a representative of the Petitioner. Early in the administration of the contract the Petitioner began to have problems obtaining employer signatures on Form BRI-100, especially where employment was obtained through union hiring halls. At the behest of the Petitioner, the Respondent deleted the requirement that the employer sign the form and permitted the form to be signed by a representative of the union hiring hall.

8. During the course of the Petitioner's performance of the subject contract, one of the Petitioner's employees submitted fraudulent documentation on numerous occasions. The fraudulent documentation purported to be evidence of successful job placements under the contract. The fraudulent documentation was submitted to the Respondent and the Respondent paid money to the Petition on the basis of the fraudulent documentation. A post-performance audit revealed that 74 of the job placements for which the Petitioner was paid were in fact fictitious placements supported by fraudulent documentation. As a result of the fraudulent documentation, the Petitioner was paid $726.00 for each of 74 fictitious job placements, a total of $53,724.00. The $53,724.00 which was paid on the basis of fraudulent documentation was paid to the Petitioner solely because at the time of making the payment the Respondent believed that the Petitioner had made 74 placements which, in fact, were never made. The Respondent's belief that the 74 placements had been made was based on the fact that the Petitioner submitted fraudulent documentation claiming payment for 74 job placements that had not been made.

9. In fairness to the Petitioner it should be noted that at the time the fraudulent documentation was submitted the officers and managing agents of the Petitioner did not know that one of their employees was preparing fraudulent documentation. Further, as soon as the officers and managing agents of the Petitioner discovered that one of their employees had been submitting fraudulent documentation, they candidly reported the problem to the Respondent.

10. The employee who prepared the fraudulent documentation described above did not abscond with the proceeds derived from his fraudulent actions. The $53,724.00 that was paid on the basis of the 74 fictitious job placements was paid to and retained by the Petitioner.

11. The Respondent did very little in the way of monitoring the subject contract. More extensive monitoring might well have resulted in earlier detection of the fraudulent documentation submitted by Petitioner's employee.

## CONCLUSIONS OF LAW

Based on the foregoing findings of fact and on the applicable statutes, rules, and court decisions, I make the following conclusions of law.

1. The Division of Administrative Hearings had jurisdiction over the subject matter of and the parties to this proceeding. Section 120.57, Fla. Stat.

2. It is well settled in this state that the language of written contracts, like the language of statutes, must be given its plain and ordinary meaning. It is also well established that contracts are to be applied and enforced so as to give meaning to the intent of the parties as expressed in the contract. It is clear from the title of the contract and from the language of the contract that the sole basis for payment to the Petitioner under the contract is the placement of eligible individuals into eligible jobs. For each such job placement the Petitioner is entitled to payment in the amount of $726.00. The Petitioner is not entitled to payment for performing any other activity required under the contract. The Petitioner was paid for 74 fictitious job placements based on the fraudulent activities of its own employee. There is no basis under the contract for the Petitioner to retain the amount paid for those 74 fictitious job placements.

3. The Petitioner argues that the contract is ambiguous and that such ambiguities should be resolved in the Petitioner's favor. There are provisions in the contract which appear to be ambiguous, but none of those provisions bear on the issues in this case. The portions of the contract relevant to this case, principally the portions that set forth the basis for payment to the Petitioner, are clear and unambiguous, and those provisions clearly limit the Petitioner's entitlement to payment under the contract to one specific thing, successful job placements.

4. The Petitioner also argues that it should be excused from repayment of the $53,724.00 in dispute because the fraudulent actions of its employees were unforeseeable. The established law is otherwise. As noted at 2 Fla. Jur. 2d, *Agency and Employment,* Section 90:

It is well settled that a principal is liable for the decit and false representations made by his agent in the scope and course of his employment, and it makes no difference whether the principal

authorized or was cognizant of the misrepresentations and deceit of his agent or not . . . . One who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons, is liable to such third persons for the fraud and he is not relieved from liability by the fact that the apparent agent acts entirely for his own purposes, unless such third persons have notice of such fact.

5. The Petitioner next argues that it should be excused from repayment because the Respondent facilitated the fraud committed by Petitioner's employee. In this regard, Petitioner directs attention to the fact that during the contract period the Respondent deleted a requirement that the employer sign Form BRI-100 when a placement was made, and that this deletion facilitated the implementation of the fraud. What this argument overlooks is that with or without the requirement of the employer's signature on the Form BRI-100, Petitioner's employee was required to forge the same number of signatures to work his fraud. The argument also overlooks the fact that the deletion of the requirement that the employer sign the Form BRI-100 was at the behest of the Petitioner, because the Petitioner was having problems getting employers to sign the forms. More fundamentally, the Petitioner must bear the responsibility for the wrongdoing of its own employee, particularly where, as here, the Petitioner has reaped the benefit of the wrongdoing.

6. A further Petitioner argument is that it should be excused from the repayment sought by the Respondent because the Respondent failed to properly monitor the Petitioner's performance under the contract. In this regard it is argued that better monitoring would likely have resulted in earlier detection of the fraudulent activities of the Petitioner's employee. The argument misses the point. The Petitioner is not being penalized because of the fraudulent activities of its employee; it is being asked to return the fruits of that fraudulent activity. The timing of the discovery of the fraud has no bearing on the Petitioner's obligation to repay fraudulently obtained funds.

7. The Petitioner next argues that it should be excused from repayment because it has substantially performed the contract. The proof is otherwise. With regard to the 74 fictitious placements which form the basis for the Respondent's claim for repayment, the greater weight of the evidence is that those 74 alleged placements were total frauds. This is not a case of doing the substance of the job and then "fudging" a little bit on the paperwork; it is a case of claiming $53,724.00 on the basis of total fiction.

8. The Petitioner's final argument is another variation on the theme

of "unforeseeable intervening actions." There is neither a factual nor a legal basis to support this argument. The only case cited in support of this argument deals with tort law rather than contract law. Simply stated, the Petitioner is not entitled under the subject contract to retain funds paid to it on the basis of fraudulent documents provided by its own employee.

## RECOMMENDATION

Based on all of the foregoing, I recommend the entry of a Final Order finding that the Petitioner has received $53,724.00 to which it is not entitled under the subject contract and ordering the Petitioner to repay that amount to the Respondent.

DONE AND ENTERED this 20th day of January, 1989, at Tallahassee, Florida.